UNITED STATES of America, ex rel., VUITTON ET FILS S.A., and Louis Vuitton S.A., Plaintiffs,

v.

KAREN BAGS, INC., Jade Handbag Co., Inc., Sol N. Klayminc and Jak Handbag Inc., Defendants and Alleged Criminal Contemnors,

and

Barry Dean Klayminc, Gerald J. Young, George Cariste, S.M.E., S.A., Crystal, S.A., David Rochman, Robert G. Pariseault, Esq. and Nathan Helfand, Additional Alleged Criminal Contemnors.

No. 83 Cr. Misc. 1, p. 22–CLB.

United States District Court, S.D. New York.

Jan. 8, 1985.

J. Joseph Bainton, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, Specially Appointed Prosecutor for the U.S.

James A. Cohen, Washington Square Legal Services, New York City, for defendant Barry Dean Klayminc.

## MEMORANDUM AND ORDER

Subpoena Request

BRIEANT, District Judge.

The criminal contemnors Sol N. Klayminc, Barry Dean Klayminc, Gerald J.

Young, George Cariste, David Rochman and Nathan Helfand were tried jointly before the Court and a jury for criminal contempt in violation of 18 U.S.C. § 401(3), in that Sol N. Klayminc, aided and abetted by the other contemnors, knowingly and wilfully violated a prior injunction issued by this Court forbidding the manufacture, distribution, sale or offer for sale of counterfeit Louis Vuitton trademarked merchandise. Following a verdict of guilty, defendants were granted an enlarged period of time for post verdict motions to dismiss the charge or grant a new trial and for other relief. The motions remain pending and undecided.

By an application to this Court for an *ex parte* order, dated November 21, 1984, contemnor Barry Klayminc, who has previously been found to be indigent, seeks leave to issue a subpoena duces tecum at Government expense pursuant to Rule 17(b), F.R. Crim.P. The stated purpose of defendant's application is to finance issuance of a subpoena to CBS News, Inc. to produce the "outtakes" from a "Sixty Minutes" program entitled "Sting Man Stings Again" which CBS aired on October 21, 1984.

The criminal trial of Barry Klayminc and others was held in May, 1984. It stemmed from the efforts of Louis Vuitton, S.A. to protect its trademark and profits from counterfeiters who had achieved remarkable success at selling fake Vuitton high fashion luggage products. See *United States v. Karen Bags, Inc.*, 592 F.Supp. 734 (S.D.N.Y.1984). According to Barry Klayminc's counsel, "a subpoena duces tecum for the 'outtakes' is necessary to provide Barry with an adequate defense since a portion of the broadcast suggests additional facts not previously before this court concerning violations of due process [by counsel for Louis Vuitton, S.A. who represented the Government in prosecuting the contempt]." (Affidavit of James A. Cohen, ¶ 5, sworn to November 20, 1984). The information is sought to support the various pending post-trial motions submitted by Barry Klayminc, especially the "Notice of Motion to Set Aside the Verdict and Dismiss the Order to Show Cause and/or for a Hearing on Due Process Violations," filed November 15, 1984. While the Court has not yet made any ruling as of this date with regard to the contemnor's post-trial motions, it seems clear that the within request for an *ex parte* order authorizing service of a subpoena upon CBS News should be, and it is, denied.

Upon reviewing the typed transcript of the 60 Minutes segment as broadcast, along with the transcript of the contemnor's trial, the Court finds that there is no showing of necessity that would justify his request for this discovery. Defendant had a full opportunity at trial to cross-examine Melvin Weinberg, the witness whose testimony is at issue. Presumably Barry Klayminc was privy to the content of whatever conversations he had with Mel Weinberg and could relate these subjects to his attorney before the trial began. Nevertheless, contemnor claims that because Mr. Weinberg will not consent to be interviewed post-trial by Mr. Cohen, and because the television segment revealed new facts, the subpoena should issue.

The "Sting" referred to consisted of an elaborate charade by which Mr. Weinberg, of Abscam fame, pretended to be a representative of organized crime and/or operators of gambling casinos, who wished to establish a substantial manufacturing organization to knock off Vuitton goods. He sought the aid of the contemnors in this effort. The foreseeable defense of entrapment or improper inducement was urged by the contemnors but rejected by the trial jury. While Weinberg was fully cross-examined at trial, his credibility was supported as to most relevant events by videotapes of his meetings with the contemnors who told the camera all that Vuitton or Weinberg wanted to know.

Contrary to defendant's view, the Court does not believe that new facts have surfaced since the time of trial such that a reexamination of Mr. Weinberg is necessary to develop an adequate defense. Mr. Weinberg's statements during the broadcast portion of the 60 Minutes program do

not differ significantly from the testimony he gave at trial. (See Government's Trial Exhibit No. 69, and Trial Tr. at pp. 343–45). Because outrageous views and expressions are generally the best news, it is hard to believe that the "outtakes," or unaired portions of the television interview of Weinberg by Mike Wallace are likely to contain any statements more inflammatory, sensational, outrageous or interesting to the defense, than what CBS chose to broadcast. To suggest otherwise, or to assert that more helpful material exists in the "outtakes" is to rely on pure conjecture.

This Court believes, more importantly, that such a request to compel disclosure of media files for this sort of fishing expedition should not lightly be granted. CBS is not a party to this action. It has no interest in the outcome. Court-ordered production of CBS' news documents under the circumstances of this case implicates serious First Amendment constitutional problems unrelated to the due process rights of Barry Klayminc.

We begin our discussion by observing that it is no longer in serious dispute that television journalists are a part of the free press, with editorial functions to perform. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 124–25, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). In its role in gathering and disseminating information, the press often is caught between the competing concerns of privacy, privilege, and the public's need to know. As a consequence, reported cases frequently have considered the First Amendment protections afforded to the press in its peculiar position as a conduit for the free flow of public information and its importance in fulfilling the societal goals which rest upon the free exchange of information and ideas. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (upholding right of press to attend criminal trials); *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (Stewart, J., concurring) (discussing constitutional role of the press as basis for requiring "effective" access to government

information); *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (invalidating pre-trial court order prohibiting press reporting of news prejudicial to a criminal defendant); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (invalidating state "right of reply" statute because its intrusion into the editorial function transgresses First Amendment standards); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Powell, J., concurring) (recognizing qualified privilege of journalist under balancing test because newsgathering is essential to a free press); *In re Grand Jury Subpoena Dated January 4, 1984*, 583 F.Supp. 991, 992 (E.D.N.Y.1984) (citing lower court cases which have upheld journalists' qualified privilege not to reveal unpublished documents or confidential sources).

■ In this Circuit, the reporter's qualified privilege is recognized as extending to both civil and criminal cases. *United States v. Burke*, 700 F.2d 70, 77 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). When a journalist claims First Amendment protection from compelled disclosure of his confidential unpublished material, the district court is required to evaluate and balance the legitimate competing interests of the journalist's First Amendment rights, including his editorial freedom to select what gathered information will be published and what will not, and the defendant's Sixth Amendment right to a fair trial. *Burke, supra* 700 F.2d at 77, *quoting United States v. Orsini*, 424 F.Supp. 229, 232 (E.D. N.Y.1976), *aff'd mem.*, 559 F.2d 1206 (2d Cir.), *cert. denied*, 434 U.S. 997, 98 S.Ct. 636, 54 L.Ed.2d 491 (1977). In addition to affirming this balancing test, the Court of Appeals has followed a standard of review which places a demanding burden upon the litigant who "seeks to subpoena documents that have been prepared by a reporter in connection with a news story ...." *Burke*, 700 F.2d at 76.

■ The test followed by the Court of Appeals, announced in *In re Petroleum*

*Products Antitrust Litigation,* 680 F.2d 5, 7–8 (2d Cir.) (*per curiam*), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), is that:

> "to protect the important interests of reporters and the public in preserving the confidentiality of the journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." (Citations omitted).

Unless the moving party can demonstrate in a specific manner that the subpoenaed documents are "highly material," and not merely cumulative, the reporter's privilege will be upheld. And, as a matter of principle, and to avoid the attrition which would flow from a failure to assert the privilege, it is customary for journalists to assert their First Amendment rights whenever applicable, and sometimes even where not applicable, lest such a valuable foundation of liberty might wither.[1]

■ The Supreme Court discussed the issue of a possible evidentiary need which might justify discovery into the editorial process of a news *defendant* in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). There the Court held that a defendant member of the press could not assert successfully an editorial privilege where the libel plaintiff needed to discover evidence in order to prove "actual malice" under the standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). 441 U.S. at 170–77, 99 S.Ct. at 1645–49. Significantly, the Court also stated that: "Of course, if inquiry into editorial conclusions threatens the suppression not only of information known or strongly suspected to be unreliable but also of truthful information, the issue would be quite different." *Id.* at 172, 99 S.Ct. at 1647. Here, Barry Klayminc is

not a civil plaintiff seeking to amass evidence against CBS in support of a libel or defamation claim; accordingly, his application for a subpoena raises this "quite different issue" and its concomitant question of whether movant's inquiry, if permitted, could act as a chill on news coverage of subjects that will trigger a media duty to grant access to news files, or limit the freedom of editorial expression in matters affecting the public interest, such as the widespread counterfeiting of trademarked high fashion goods and the wilful disobedience of court injunctions.

In *Herbert v. Lando,* the argument that compelled disclosure of editorial conversations would have an intolerable chilling effect was held to be an argument without merit solely because the claimed inhibition flowed from fear of damages liability on the part of the holder of the First Amendment privilege; an effect which *Sullivan* found to be consistent with the First Amendment. 441 U.S. at 171, 99 S.Ct. at 1646. Here, the chilling effect if this subpoena should issue would be due to fear that every time a television documentary, made *after* completion of a criminal trial, contained reference to that crime, the criminal defendant would be able to scour the media files in support of a motion for post-conviction relief. It is reasonable to assume that members of the press would be reluctant to take on the obligation of producing sources, notes, files, or "outtakes," to criminal defendants whose completed trials are reported in the news. Yet if we were to authorize the requested subpoena, this is precisely the burden that would ultimately be placed upon news reporters and upon the process of editorial analysis.

The resulting possibility of a chill on a news broadcaster's willingness to interview trial witnesses or otherwise report and editorialize on completed court proceedings vital to the public interest, in the analytical fashion demanded by the reporter's duty to

---

1. Defendant's attorney has informed the Court that CBS refused his informal request for the documents. This application is for an *ex parte* order, and was made without notice to CBS or the Special Prosecutor. Accordingly, there is no pending motion to quash. No purpose would

be served in issuing the subpoena merely for the purpose of inviting such a motion, since it is clear that such a motion would have to be made for institutional reasons, and, as explained in the text, if made, would have to be granted.

the public, presents an impermissible risk to First Amendment freedoms. This is not a case where the danger of pre-trial publicity might prejudice a criminal defendant's constitutional rights to a fair trial, since the trial was over when the broadcast was produced and exhibited. *See Nebraska Press Association, supra; Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

There is no practical need for the relief sought. Contemnor Barry Klayminc has had an ample opportunity at his trial to impeach the credibility of Melvin Weinberg by cross-examination or by investigation. He also had the opportunity to raise arguments and to present facts in support of his claim that the conduct of his prosecution violated due process standards. *See United States v. Karen Bags, Inc.,* 592 F.Supp. 734, 742–48 (S.D.N.Y.1984); Hearing Transcript, Oct. 5, 1984; Trial Transcript, May, 1984, pp. 185, 289–328. Any further facts that might possibly be gleaned from the CBS "outtakes" are likely to be merely cumulative, and not probative of the constitutional violations asserted by Barry Klayminc. This motion, then, is at most based on a hypothesis or "hunch," lacking a logical basis, that because there are "outtakes" which show Weinberg speaking, he must have said something which reflects adversely on his own credibility or demonstrates the innocence of Klayminc. This *non sequitur* is insufficient as a specific showing of need for "highly material" or "critical" information, required under *United States v. Burke, supra.* The illogical character of this request becomes apparent if we hypothesize that after verdict in a criminal trial a witness for the prosecution was known to have spent the evening at his favorite dram shop, leaning across the bar, foot on the brass rail, imbibing while telling his life story to the boniface. Would a subpoena issue on the theory that what was told in the tavern must have been inconsistent with the testimony at trial? We note that habitues of saloons and guests at talk shows are usually not placed under oath, and in both cases temptations are great for exaggeration and for the speaker placing himself in the most favorable light. The resulting information in each case is likely to be of little or no evidentiary value in court.

This case is readily distinguishable from *Westmoreland v. CBS, Inc.,* 97 F.R.D. 703 (S.D.N.Y.1983). In *Westmoreland* the Court found that CBS, a party, had attempted to "blow hot and cold" by holding out the content of its otherwise privileged report to the public in support of its litigation posture, and then at the same time refusing to produce the unpublished report because of a claimed journalistic privilege. To initiate procedures looking to compel CBS as a *non-party* to respond to a subpoena duces tecum for unpublished outtakes, despite CBS' important right to First Amendment protection of its editorial process, and upon an inadequate showing of need by contemnor Barry Klayminc, is a first step leading onto a slippery slope, and one which this Court declines to take in this case.

Accordingly, defendant's application pursuant to Rule 17(b), F.R.Crim.P. for an *ex parte* order is hereby denied.

So Ordered.